Scott Sherhart, Kenny County Clerk Alvarado, Kenny County Sheriff Coe, and Val Verde County Sheriff Martinez. Appellees seek to impose what can only be called vicarious liability on these particular defendants. However, it is black-letter law that vicarious liability is inapplicable to a 1983 claim. A plaintiff must plead that each government official defendant, through the official's own individual actions, has violated the Constitution. That's from Iqbal. Plaintiff's complaint fails this test, and the trial court erred in denying the county's officer's motion to dismiss. With regard to County Clerk Alvarado, this is the only defendant that we can say there are allegations that they actually took part in something that could have led to a deprivation. The claim is that the county clerk stamped Ruiz de la Cruz's plea paperwork and filed it 14 days after the plea was entered. However, there's something missing. What's missing is, when did the clerk get the paperwork? We represented to the trial court that the paperwork was stamped on the exact same day that the clerk received it, and that's what we believed. But plaintiff's pleadings are just as consistent with either case. They only plead that he stamped and filed the paperwork 14 days after the plea was entered. There aren't any factual pleadings that say, Clerk Alvarado got the plea documents, 14 days, held on to them, hid them in his office or something, and then stamped them. Those... Have you ever been done in the case? No, this is on a motion to dismiss, Your Honor. How could that possibly... I'm sorry. Go ahead. I think we're going to ask the plaintiff. How could they possibly plead with any more specificity, given the fact they haven't yet had discovery of how exactly long he had the document? It seems like the information is solely in the possession of the other party, and we've been cautioned in those types of situations. Because an order such as that is public record, and it would be easily obtainable. We were able to determine immediately that that document was stamped when it was delivered to the clerk, and we provided evidence to the court. How do we know when it was delivered to the clerk? I mean, that's between the court and the clerk, isn't it? Well, it wouldn't be that way if... Because what happened in this particular case was a little bit different, and this is outside the facts that are pled. And that is a problem. I mean, that's a problem for you if you have to argue outside the facts that are pled. Exactly. Exactly. But the problem with this is, either scenario would fit under plaintiff's allegations. There aren't... There is no allegation that he received the documents, held on to them for some unknown reason, and stamped them 14 days later. It's just not... It's just not in the pleadings. There's no facts... He stamped 14 days after the fact. The allegation is that it was 14 days after a plea, and that some unknown person promised Mr. de la Cruz that he would be released. So it's either the court or the clerk. It could be the court or the clerk. In this case, it wasn't either. It was defendant's counsel that was negotiating the terms of a deal with the county attorney, and the county attorney didn't turn it loose until 14 days later. But if there had been an order, it would have been publicly available, and you could have pled that he had it. That's not what happened. It's the delivery of it to be put on the docket, so that's totally within the thing of the court. Exactly. Exactly. But the court's not a defendant in this case. The clerk is. But that's either the court or the clerk. The county attorney's not... After the proceeding has happened, it's up to the court or the clerk. I understand that, Your Honor. This was a very unusual circumstance. Operation Lone Star flooded Val Verde and Kinney Counties with a tremendous number of arrestees, most of which were arrested by DPS. In the case of Ollie's, they were arrested by DPS. And so there were approximately 208,000 arrests in the first year of the program. So you go from a sleepy county like Kinney County, who normally wouldn't have very many prisoners in jail, to having thousands of prisoners that were ostensibly in custody, but within facilities that were controlled by the state. But we get back to the pleadings as the issue. There's no facts pled that have showed that he intentionally withheld the paperwork or that anyone called him and he was deliberately indifferent to the call, much like some of the cases that have come through the Fifth Circuit recently. There's no facts to demonstrate that any other detainees were over-detained because he failed to process the paperwork in a timely fashion. You're not relying upon, you're not really relying on judicial immunity here. You're relying on qualified immunity, aren't you? I'm arguing qualified immunity right now. However, I think that there's an argument that it's quasi-judicial immunity and that the clerk does things that are pursuant to the judge's order. Right, but you would have to come forward with something to say it was non-routine under command of the court decrees or under explicit instructions of a judge, and you can't do that on the record itself. I can't do that on this particular record. On this record right now, so that doesn't work for you to get out of the case right now. That doesn't work. Okay. What I'm saying is my friends on the other side haven't pled sufficient facts to make a connection to say that Clerk Alvarado is responsible for this delay. The delay could have been caused by any number of things, but it could be just as inconsistent that he, he can't merely plead something that is consistent with someone's fault. You have to show that some facts to connect them to the alleged wrong. And I'm going to switch over to Kennedy County Sheriff Brad Coe. So, plaintiff hasn't pled any facts to demonstrate that the sheriff did anything to contribute to Ruiz de la Cruz's over-detention. The facts as pled were that the paperwork wasn't stamped until 14 days after the plea. He was released the same day. There's no allegation that the sheriff did anything. There's no allegation that the sheriff was a supervisor of the, the, the county clerk. In fact, they can't be. They're both elected officials under Texas law. Supervisory. The county's role, the sheriff's role is after the stamping, right? Right. And so, if the stamping is done on the 14th day as is pled, and the duty for him is established, then that duty's done that day. He was released on the same day. And that's the duty of the sheriff, and there doesn't seem to be factually a delay on the sheriff's part. I don't see anything in, in the pleadings that say that there was a factual delay in the sheriff's part. But plaintiff tried to, to style these as supervisory claims, and they don't. The sheriff doesn't supervise the clerk's office, does he? The sheriff doesn't supervise the clerk's office. There's no allegation that... The judge supervises the clerk's office. The judge supervises the clerk's office. But there's no allegation that any sheriff's deputy or other county employee had anything to do with this. We have another, parallel elected officials, a district, a county clerk and the sheriff, which have different duties. But there's no delay in the pleadings that can be attributed to Sheriff Cuttle. What about Taylor? Can you do the other ones, Taylor and Martinez? I can't do Taylor because he is represented by the state of Texas. And he's not my client. Okay. Can you go to the next one? Sheriff Martinez, I can. In Sheriff Martinez's case, there aren't any facts to show that Sheriff Martinez would in any way cause a delay in the, in the release of any of the three defendants that were, or three arrestees that were arrested in Val Verde County. The allegation is that Roble's attorney contacted staff at the Briscoe Unit, Texas Department of Criminal Justice, the Val Verde County Facility and the Val Verde County on January 28th and he was released the next day. But there's no allegation that anybody called the sheriff's department or talked to anybody at the sheriff's department. Is there any allegation that the sheriffs are keeping people in there after they have stamped documents? No. In fact, there's no allegation that the sheriff had anything to do with this. In the case of the other two arrestees, the defense attorney contacted an employee at the sheriff's department and he was released the exact same day that that was done. But if you look at the factual pleadings, the county attorney almost immediately sent a notice to the Val Verde Connection Center saying, we don't, we're not going to prosecute these two. It's inexplicable what happened to them, but that should have caused them to be released immediately. But if they weren't sitting on orders, were they sitting on orders that said release of them and they're keeping them in the jail? We've had that in the circuit, I think, where people have orders to release people and they don't release them. That's not this situation. That's not this situation. That's not pleaded here, is that? That's not this situation. And there's no allegation of that. At this, those... They were saying they got a notice from the prosecutor that would not... Yeah. The county attorney sends them a letter and says, we're not going to prosecute these two. Turn them loose. In fact, that's in the allegations in the complaint. And what happened? We don't know. Nothing happened. But they weren't released. They weren't released. That letter was sent to the... Were they in the custody of the sheriff? They were in the... Well, they were ostensibly in the custody of the sheriff, but they were in a facility that was being run by the state with state employees. And so that communication didn't go to the sheriff. It went to the Val Verde Corrections Unit and to the unit. So the sheriff didn't get that letter? The sheriff didn't... There was no allegation when the sheriff received that letter. And that's a problem. The sheriff needs to know if he's going to do something about it. So that could be unsafe. So you're saying they... They would have been in his custody and the prosecutor is saying you need to release them. The prosecutor just didn't know who to send the letter to, maybe? I think the prosecutor probably knew who to send the letter to, but for some reason, something happened and they didn't get released. And there's no real good explanation for that. Certainly, holding somebody... But you're certain it wasn't the sheriff? Well, it wasn't the sheriff that directed that they don't be released. He didn't know anything about this. When you've got so many arrestees and they're being held in these different facilities that are being manned by the state, it would be like asking the New Orleans County... The New Orleans Parish Sheriff to know what the status was of each individual in the jail. Well, that would be kind of ridiculous. Of course, they could probably...  Exactly. He did not get that letter. But he was never sent that letter and there's no allegation to that effect. You know that in this record? That extra record? There's no allegation in the... There's no allegation that he received the letter. That's exactly right. Okay. Is that all of your clients? Well, it's a supervisory...  Is that a state person, Cerrone? The Senior Warden of Briscoe Prison, that's a state person. Yes. And Ramirez, that's a state person. That's not yours. That's not... Coe, the Kenney County Sheriff, did we already cover... The Brad Coe that we talked about already. Gonzalez, the Senior Warden of Govia, that's not you. That's not mine. Did we cover all your people? We did. Okay. I want to say a little something about supervisory liability because what we have is allegations that there are these policies in place, but there are no allegations that these policies were ever followed in any one of these incidents. So, you know, just saying that there's a policy without having it, you know, demonstrating it was followed and that's what caused the delay is problematic. It doesn't plausibly state a claim. There's a policy that Sheriff Coe had that he would have circuitous communications to double-check to see if there was an ICE detainer, to double-check if this was... and all this other stuff. But there's no evidence, there's nothing, there's no allegation that that policy was actually followed. In fact, the defendant in that particular case was released on the same day. But they need to allege that, one, there is a policy. And how that policy was followed. I'm sorry. They need to allege that the policy was followed. So that allegation is missing. That allegation is totally missing. That's correct. The last... If I may, supervisory officers can be liable if they have a personal participation in something. Or if they adopt a policy that's unconstitutional. Or if they fail to adopt a policy that when they see that their employees are repeatedly doing something wrong and they don't do anything about it. In this case, there's no allegations that either of the sheriff's department's personnel did anything that would put the sheriff on notice that people were being over-detained. In fact, there's nothing alleged to show that either of the sheriffs would know that there was a problem with detainment. The only evidence there was is an allegation of some testimony by a state actor and not by any of the sheriffs. So this is unlike some of the cases that you've dealt with recently. And I see my time is up. I beg your indulgence. We'll hear from Mr. Scanlon. Thank you. Thank you, Chief Judge Elrod. May it please the Court. Plaintiff's claims against Ronnie Taylor and the senior wardens should be dismissed because they are a blunt force attempt to apply vicarious liability on state officials. Both this court and the Supreme Court have long held it's not available for Section 1983 claims. The pleadings do not create an inference that any of the state officials personally or indirectly caused the alleged over-detentions. Did they get letters and not release the people? There is an allegation that Mr. Taylor was sent a letter from the county attorney. We're not pursuing these people. They let him go and he didn't. The county attorney is saying basically in the complaint what it says is that charges are being dropped and that he's going to recommend that they be released immediately. That's the word that they used. First, there's not a factually sufficient inference that Mr. Taylor actually received that letter. But beyond that, even if... Even, Your Honor, no. Because even if Mr. Taylor did receive the letter, he was not in a position to release them. He had neither legal nor physical custody. No, Your Honor, he's... He was in charge of the Val Verde Temporary Processing Center, and there's no allegations that anyone spent any extended amount of time there. He was a state employee at the time, and I'm not sure... Correct, and I would have to double-check the... Was that his responsibility? That is the allegation, Your Honor. Of course, we're at the motion-to-dismiss stage, so I don't concede any of their... Neither confirmed nor denied, but they made that allegation. Correct, Your Honor. And I would... Your Honor, motion to dismiss without any discussion. Well, the reason that they lose on that is because Mr. Taylor, you know, is alleged, I guess, personal, to have been personally involved in the alleged over-detentions, which is impossible, because he had neither physical nor legal custody over them at the time. He's also... No, Your Honor, and the reason for... So, under this Court's precedent, it's required that he be deliberately indifferent, and in the context of policy, they have to show that there is some causal connection between a failure to adopt a policy and the over-detention. That's the wrong word I used, of course. They need to plead that there was some causal connection. Other than conclusory allegations, they don't get there. We've cited the Oliver v. Scott for that proposition in this deliberate indifference context in our brief. And even under their most favorable case, which is the Crittenden line of cases, they don't get there in terms of policy. Again, the Court should be very reluctant to further expand vicarious liability for these state officials. I don't know that this is vicarious liability. I don't see that. I thought he's... According to the pleadings, his job is to manage the detention and coordinate between all these people to make sure they don't fall through the cracks, and we have a specific person that's fallen through the cracks, allegedly. So, it's not a vicarious... We have some policy out in the air, and you didn't comply with it, and we're not sure of that policy. His actual job is to do this, and we have specific showings of times where it wasn't done, and it caused people to be over-detained. So, that's not... That's different. He's not a random head of some agency or something that has nothing to do with it. They're saying his specific job is to coordinate between these prisons. Yes, Your Honor, I want to get back to something you said earlier when Mr. Shearheart was talking about delay, because the allegation is that all of these officials somehow caused the delay. But if you look at the specific pleadings with regard to Mr. Taylor, there's not an allegation that he was causing the delay. What they say is that they conceived this on pages 39 through 41, and then page 43 where they talk about the release. So... There's a legal argument to Your Honor, basically, and I want to go back to what Sheriff Martinez actually argued on page 19 of his brief. He notes that there's no legal authority to release a detainee who's subject to an order of finding a probable cause, which they don't contest. They concede that on footnote one of their complaint. So, if everyone's required to be detained, the requirement for release only comes from a court order, and there's not an allegation that Mr. Taylor was presented with a court order that they were required to be released. To the extent he's accused of having a policy, they also acknowledge in their complaint, page 37 of the record, that it was his practice to regularly forward allegations of overdetention from defense counsel to the wardens and the sheriffs to put them on notice. That's also important because the complaint states that with regard to... I'm sorry, I striked that. I want to move on to addressing the wardens with the limited time I have left. I will let you address the wardens, but we've got to finish Mr. Taylor first. I'm sorry. I don't understand where you got that. It says that Defendant Taylor was responsible for formulating, implementing, and executing policies, customs, and practices applicable to the VVTCPC. His responsibilities included ensuring that all defendants detained under the catch and release program were timely released from custody. He was responsible for the training and the supervision of the staff. He had authority to design, implement, and change policies, customs, and practices, and he was acting under the color of state law. He sued in his individual capacity. He was responsible for implementing and designing the processes for intake and release that are alleged to have fallen through the cracks here. So why is that vicarious? Your Honor, I think that's a lot of words to basically say that because he's the person in charge of the facility, he must be liable. He's not in charge of the facility. He's in charge of the coordination between the facilities for catch and release specifically. I think even if you assume that the letter was sent and received, he would only be negligent if he read it and then failed to take action. In Estate v. Davis, which we cite in our brief, it says that's not enough to reach the deliberate indifference pleading standard, which the Supreme Court in Conica says is a heightened standard. I think that that's going to probably be the best I can do on Mr. Taylor. If you're not convinced, I want to move to the wardens because, again, going back to your note about delay, the specific allegations against all the wardens show that when TDCJ was notified that they were supposed to be released, they were released either the very same day or the next day in the case of Mr. Garces Robles. Also, the fact that they were under the legal custody of the sheriff is relevant. The complaint alleges at page 35 of the record, quote, TDCJ houses the individual on the sheriff's behalf and affirms that the sheriff retains authority over time calculation and release. Specifically with regard to Warden Gonzales, as you discussed with Mr. Shearheart earlier, the 14-day delay would have meant that Ruiz Taylor Cruz was released a day after he would have been provided notice. It would have been impossible for Warden Gonzales to effectuate his release earlier under a proper court order, which is what the Code of Criminal Procedure requires. What about the others? So in the case of Warden Ramirez, there's no specific allegation that she personally caused an overdetention, and under the claim that they're making that it was her policies, there's not a reasonable inference to be drawn from any of those allegations that her failure to adopt a policy caused the overdetentions, mostly because the allegations, say, at page 40 through 41 on the complaint in the record, she was responsible for specifically the SOTOs who were released from TDCJ the same day she's alleged to have received notice. And then John Cerrone, there really are no facts alleged against him. Garces Robles alleges that the court enters into order dropping charges. I see I'm out of time, Your Honor. May I finish pretty quickly?  Drops charges on January 10th. Defense counsel calls the prison on January 28th. He's released the next day, and that's not enough to show that John Cerrone was deliberately indifferent. Mr. Robles was at Briscoe Prison. Correct. And the charges were dismissed on January 10th, and then he received the court order directing his release the same day, but he didn't get the release until January 28th, and what is the statement on that? So there's an allegation under information and belief that he received a court order. There's no allegation that Warden Gonzales was on notice of that happening. There's no allegation they didn't know that, wouldn't you assume that the prison gets sent the, if Mr. Taylor's doing his job, isn't the prison getting sent the notices? I think that they allege and they acknowledge, page 37 of the record in their complaint, that Mr. Taylor always forwarded those paperwork, well, the allegations. If Mr. Taylor always forwarded the paperwork, then they would have gotten it on January 10th, and he wasn't released until January 28th. I'm just looking at the complaint. This may not be true at all. I'm just reading from the record. Right. And so we're talking about John Cerrone. They just don't draw the connection between that and the warden. If Mr. Warden had a paperwork on January 10th, and he didn't do anything until January 28th, about a particular inmate under our precedent, which you may not like, but it exists, aren't we bound to say that the warden can be in the suit? I would agree with that, but that's not what they've alleged in their complaint. Help. Page 39. Explain what's on page 39. It's the smoking gun that means you win no matter what. That's really just where they explain what happens. They say, Garces Robles, on information and belief, received a court order for his dismissal. They don't explain that in any way. That's a conclusory. What page 39 is, because I'm reading the complaint, and there's not a page 39. It would be page 39 of the record. I'm very sorry about that, Your Honor. Okay. 39 of the record, which is what? So that's the complaint where they talk about... What is lacking? Can you tell me what's lacking? They haven't explained, with regards to the wardens, they haven't explained how those wardens' failure to adopt any policies is causally related to the over-detention. We're talking about a policy. We're talking about the warden got a notice about these particular people and didn't release them. That's a different claim altogether. Correct. If I'm not mistaken, there are no... My colleague on the other side can address, but my understanding is there's not an allegation that any of the wardens were personally involved, because they don't make the allegation that warden Theron... Do we have case law that says if the warden does the paperwork and doesn't release them, then they're on the hook, could be on the hook, at least be on 12B? I'm not sure of anything directly on point with that in the context of pretrial detainees. We have the Crittenden line of cases, of course, that say if there's personal notice that someone's being over-detained and the warden is shown to have acted promptly, that's in the Crittenden cases, then they're entitled to qualified immunity. So the mere fact that they were over-detained, if the facts also show that they took prompt action, and they do here, because they... We can't look at any facts to see if they took prompt action. If they got it on January 10th and it was not released until January 28th, we don't yet know whether they took prompt action or not. We're talking about John Theron. My understanding is there's not a specific allegation that he received it on January 10th. The prisoner received, is alleged to have received the court order on that date. I'm sorry, the detainee, he's not a prisoner. Okay. Is there no further questions? Thank you very much. Maybe you can help clear some of this up for us, Ms. Carlo-Gonzalez. Good morning, Your Honors. I'm here to speak to the court. This appeal is about the narrow question, of whether the plaintiffs have alleged a violation of their clearly established constitutional rights. As the district court correctly found, the answer to that question is yes. This court has long recognized a constitutional right to the timely release from jail. If there's no basis to hold someone, they must be released and they can't continue to be held. This has been the rule in this court for the past 50 years. This has been the rule under Texas law for a century. As alleged in the complaint, the plaintiffs here were arrested and charged on misdemeanor trespass charges in Texas in Kinney County and Valverde County. Three of them had all charges against them dropped. The fourth pled guilty after spending 110 days in jail and received a sentence of time served. Instead of being released, they were held for 13 to 42 days. The complaint alleges in detail how each appellant is responsible for the plaintiff's overdetention. The complaint identifies what policy was at issue, who was responsible for what portion of the release process, what they failed to do, and how that caused and resulted in the plaintiff's overdetention. The complaint also alleges why the supervisory liability claims that each of the appellants should have been known and were deliberately indifferent to the risk of overdetention here. Can you go through the people, please? Because it seems that it's very fact-specific. And how is the clerk of the court who stamps the thing on the very day that he or she got it responsible? Yes, Your Honor. So it might be helpful here to go through the theories that we have, which encompasses all of the appellants. Can we just deal with the clerk of the court first? Sure. Yes, so the clerk of Kinney County was responsible for taking plea paperwork and stamping it for the record. And he was responsible for stamping that paperwork for Plaintiff Royce De La Cruz, who was the only plaintiff who pled guilty. So as alleged in the complaint, Plaintiff Alvarado had a practice and policy and custom of delaying the stamping of plea paperwork once he received it. Contrary to what a colleague on the other side has said, there is allegations that the plea paperwork was issued for Plaintiff Royce De La Cruz and that it would have gone to the appellant Alvarado. It was issued and sat on the desk instead of stamped on the day they got it. I'm sorry, Your Honor. Could you repeat the question? As I understand the argument from your friend on the other side, the clerk got the paperwork and stamped it that very day. So how is the clerk responsible? You're saying the clerk let it sit on the desk and didn't stamp it. I don't know what's in the pleadings, even though I have the pleadings and have scoured the pleadings. It's very complicated. So did the clerk have it sitting on the desk and is that what's pled and didn't stamp it for some reason? And was that just because the clerk was really busy? And so that's, can you help with the clerk? The clerk seems to have the smallest role, no offense to their important role, in this process, and can we deal with the clerk separately from the wardens and all of that? Yes, Your Honor. So it is pled that he did have the paperwork, that the paperwork was issued by the court and went directly to Alvarado, and that he didn't stamp the paperwork for 14 days. Where is that? Your Honor, it would be paragraph 103 in the complaint, which says... Defendant Alvarado received plea paperwork from the presiding court. Yes, Your Honor. Can you say when they received it? Yes, so the specific date is not alleged in the complaint, but the fact that this policy applied to Plaintiff Ruiz de la Cruz is alleged. And so, Your Honor, I think the reasonable inference to be drawn from that is that the paperwork was sent to him after the plea was issued, and he does receive the paperwork directly from the presiding court. But the court could have not issued it yet because they're waiting to hear back from the county attorney. Your Honor, so that would be a factual dispute, and we think that's something that's best addressed after discovery. I think as well, whether or not there was any reasonable delay in stamping paperwork, that's something that's not necessary to address at this stage of the proceedings and is something that would be... Did you plead enough to create those inferences? Yes, Your Honor, we believe... You didn't say it was sat on the desk for some reason. No, Your Honor, it doesn't use those words, sat on the desk, but we do allege that the plea paperwork from the court is issued and sent directly to Alvarado and that he had to personally stamp the paperwork. But we don't know the date that it was issued from the court. No, Your Honor, but we do know the date that it was ultimately stamped. And the specific... It could take a while to get paperwork done. Yes, Your Honor, but that is something we would submit is best addressed after discovery, is that would raise a factual issue. On the pleadings here, we believe we've... Because, well, I don't know how this court was formed, but oftentimes there's actually a clerk sitting in court during a plea. So, Your Honor, that could be the case. We don't know that. Yet we don't know that on the record here of where exactly Alvarado was and exactly how he received the paperwork and what the process was for sending it. Are you saying he's in some kind of big policy that he's on purpose doing this because he doesn't like these people and he's going to take his time as opposed to just being slow or unorganized? Your Honor, that's not alleged in the complaint, but we would say that there's no meaningful distinction between that here. Whether or not the policy was intended because he didn't like a particular group or not wouldn't change the fact that if he had, as alleged in the complaint, he had a policy of delaying stamping plea paperwork, which was necessary for people to be released. And under this court's precedent. I have a policy of delay stamping paperwork. I'm intentionally delaying stamping paperwork. The common sense would be I'm slow because I have a stack of stuff and I either procrastinate or I have so much paperwork I can't get to it. Your Honor, another way to frame it would be a failure to adopt policies to ensure that paperwork was timely processed. And whether or not it was because of administrative delays, the plaintiff, as alleged in the complaint, was detained past the time he was entitled to release for 14 days. And under this court's precedent, knowing that receiving the plea paperwork that would show the sentence and would have a signal to Alvarado that he needed to release or that this person was entitled to release immediately, under this court's precedent, that would establish a deliberate indifference. But the judge wasn't sued? I'm sorry, Your Honor. The judge was not sued? No, Your Honor. The judge was not sued here. Can you do the sheriff now? Sure. Yes, Your Honor. So the sheriffs are sued for supervisory liability claims. So as for both of the sheriffs, they're responsible for ensuring that once someone is entitled to release and after release paperwork is issued for them, that they need to make sure that that paperwork is timely processed. And so Crittenton here is, we believe, is controlling on this point because under state law, the sheriffs had a duty and responsibility to supervise the entire release process. Under Texas law, they are the keepers of the county jail. Do you have any, does it say in this complaint, that they knew that the orders had been issued and then disregarded them? So, Your Honor, yes. So notice is pled here. So as for the supervisory liability claims. Where does it say that these sheriffs actually knew that the orders had been and then they disregarded it? So, Your Honor, we have to admit for the supervisory liability claims, the sheriffs didn't need to know that the specific order had been issued. What they need to know is that there is a, that other people were being over-detained, that there was a pattern or process of this happening, such that they could be charged with deliberate indifference as a supervisor for this. And the allegations of notice here are that the appellants collectively over-detained 80 individuals within this system. Additionally, the appellants had received correspondence, defendant Taylor had received letters complaining from attorneys saying that people were being over-detained and they were asking about their clients. Taylor, that's not the sheriff. Yes, Your Honor, he forwarded these. So as alleged in the complaint, he forwarded these on to the other appellants, which would include the sheriffs. This would also include the wardens as well. Okay. How are the sheriffs responsible for what's going on in the state detention center? So the reason they're responsible, it comes from state law, the source of their responsibility for it, because they... Where in state law? What is the state law and what does it say is the sheriff's responsibility for what's going on in the state detention center? I understand if it was the county jail, but it's not. Yes, Your Honor. So it's Texas local government code, section 351.041. It states that the sheriff of each county is the keeper of the county jail. But it's the county jail, which I just said, the county jail. These people are not in the county jail. They're in a state detention center. So what ties the sheriff to the state detention facility? So, Your Honor, legally for all purposes, the prisons are run by the state, by TDCJ, but they are operating as county jails. So as alleged in the complaint, the sheriff retains legal custody over everyone who goes into... Is that in the agreement between the parties, some kind of joint mutual agreement between the state and the county that set up these things? Your Honor, so I believe we allege that there's a letter that's sent that asks... It's from the county that requests that the state house people under county authority. So they are operating as county jails and they're licensed as county jails. So for legal purposes, for legal custody, the sheriff retains legal custody of everyone who is in Briscoe Prison and Segovia Prison who's arrested under this program. So that's one of the theories as to the sheriff, which is that they're responsible for supervising this process and ensuring that once paperwork is issued, that all of the people within this system and within this process are processing paperwork in a timely manner. Additionally as well, and there are allegations and these apply as well... What is a timely manner if you're deluged? Your Honor, that's not in the complaint. I think at this stage the court doesn't need to decide what is timely. Crittenden made clear as well as this court's other precedents that surely 30 days at a minimum is a per se constitutional violation and that is established for two of the plaintiffs who were held for 42 days. Whether or not, what reasons there might have been for the delays is something that will be resolved after discovery and we don't need to plead that in the complaint. Because you know, these counties are deluged with tremendous amounts of people to process in a big operation with people just coming in. You understand that the practicalities of this are very difficult. Yes, Your Honor. We think this still is something that's best decided as a factual matter after discovery and is not incorporated into the pleading standards or something. Does that make it hard to win on qualified immunity? Because you have to overcome qualified immunity and there has to be similar... It either has to be obvious or it has to be similar factual scenarios. And if this is a unique situation where counties are deluged from this border operation and they're just, you know... No one can keep... You know, this is the most... So many things and you couldn't possibly keep up. No one could keep up. Maybe AI could keep up, but they don't have AI systems at the Val Verde jail, you know. So, what is the... Tell me what's your best case on qualified immunity on that. Yes, Your Honor. So, we believe there's a number of helpful cases on that front. I would first note, though, that there's... In the complaint, there are no allegations that would establish a reasonable justification for the delays here. You know, that would depend... That type of defense, if it were raised by the appellants, would be something that they would raise after discovery, after... It's a disaster. That's in the complaint. There's a disaster in the state of Texas. It's a disaster. That's a huge declaration. The governor has made a disaster declaration and renewed it. Every month, this is being renewed as a disaster. That's a... You know, Hurricane Katrina is a disaster, and we had interrupted court operations, although due to my colleagues sitting here to my right, they did very well in getting up to speed and keeping up with the docket. But it seems that this is a disaster going on, and so how can you show that there... Do you have to overcome qualified immunity in a disaster? Yes, Your Honor. So we don't necessarily have a case saying... applying this into a disaster context, but, you know, the scope of what this disaster would constitute and what delay would be reasonable is a fact issue, and that's something that we do not need to plead here. In terms of the cases that are most... that in a disaster they fail to meet their constitutional responsibility, you don't have to overcome that right now on qualified immunity. Not at the motion-to-dismiss stage, Your Honor. Well, qualified immunity does come into play at the motion-to-dismiss stage. Yes, but, Your Honor, the standards here for qualified immunity is whether on the facts that have been pleaded, whether or not those facts would establish a clearly established constitutional violation. Well, that's what is the clearly established violation in a disaster. We would say that the nexus here is not... does not need to be as tight on the disaster front, especially because of the fact that there are very few facts pleaded in the complaint that would support, you know, the scope of what the disaster is. As I understand it, the complaint alleges that a disaster declaration was issued by the governor of Texas, but doesn't describe the circumstances surrounding it. In terms of the cases that are most directly on point, the Crittenden line of cases, which includes Crittenden, Parker, Hicks and McNeil, we believe are all directly on point. You say the governor issued a disaster declaration. So what does he do? What happens? He signs a piece of paper saying disaster, and he says what it is. What happens then? Your Honor, so I think my understanding of it, and I'm not sure how much detail is put into the complaint here, but my understanding is that the governor issued a disaster declaration, which allowed for funding to be moved to the counties in order to create... to help fund the law enforcement system that was in place here and to support the catch-and-jail program. But the responsibility here, wholly apart from who's got the money, is the direct responsibility is where to deal with this. Ultimately, the responsibility would say falls on the sheriff for all the people who are held in custody, because we would also submit that, even separate from whether or not there's a case on this point, it is clear, and it has been clear for the past 50 years, that people cannot be held without a lawful basis for doing so, and that that would be, in and of itself, an obvious case for... that they would realize that they were over-detaining people and that they were violating their constitutional rights. I'm going to say it falls on the sheriff, and it also falls on all of the appellants, because each of them were separately involved with processing paperwork, and the complaint here alleges that not only were the sheriffs responsible for overseeing the process, but that each of the appellants received paperwork, and that they then didn't process that paperwork for days to a week, and that collectively this contributed to the plaintiff's over-detention. So processing that paperwork, that falls on them, and that would be their responsibility. Turning to the Crittenden... How do you fix that? I mean, you say the sheriffs are responsible, so what do you do to fix that? Your Honor, so I think two responses to it is that, one, as alleged here, the appellants did not do anything, is the issue. And so what exactly is required and what they needed to have done, that would also be a fact dispute that we believe is not... does not need to be pleaded around here. You know, the legal framework to deal with this problem is what I'm asking about. It's not a fact question. What's the legal framework for dealing with the problem? We'd say the legal framework for dealing with the problem would have been to take some step or some action to have notified someone or ensured that these people would be... that their paperwork would be timely processed. So, for example, in... you know, if you take one of the wardens who was responsible for receiving paperwork, something that they needed to have done here was to have adopted policies to ensure that when paperwork was received by them for someone who needed to be released, that that was done in a timely manner. So adopting policies is what they needed to do here because they were responsible for ensuring that that paperwork was timely processed. And who checks them? So... You say the sheriff is responsible, is what you're saying. Yes, so they're both responsible. So the sheriff is ultimately responsible for ensuring that people are timely released who are within their custody. But additionally as well, so for any appellant who received paperwork or if their office received paperwork, they were responsible for ensuring that either they or the people that worked for them had policies in place that would make sure that paperwork was timely processed. These are... This is exactly the fact pattern that was at issue in Crittenden. So in Crittenden, there was that same system of... There's the state prisoners who were held... State prisoners were being held in local parish jails under state custody. And it was ultimately the state officer's responsibility to ensure that paperwork was being timely processed even though they personally were not responsible for processing that paperwork. Here the facts are that the appellants here are closer to that process than in Crittenden because in this case, the appellants were responsible for actually processing the paperwork. So not only were they responsible... Not only were the sheriffs responsible for supervising it together, but the individual appellants had a duty once that paperwork came in that they had a policy in place to make sure it was processed in a timely manner. And we believe Crittenden and McNeil both involved the failure to timely process paperwork. And we believe... Not in the context of a disaster deluge on the border. Those are regular operations of prisons in Louisiana, I believe. Business as usual. Yes, Your Honor. So those did not involve a disaster. We do not believe at this stage that we need to plead or identify a case that involved a similar disaster situation because we believe the right to a timely release is clearly established. It is clear, and it has been clear under this Court's precedent since Wuerl, which was in 1969, and it's been clear since then that people cannot be held without lawful basis. And that if a person is aware that people are being held beyond the time of their sentence, we believe it is sufficiently clear that they should know that they need to do something about that because that would result in a constitutional violation. Could ICE have continued to hold the people? And if so, if they could be legitimately held, is there a constitutional deprivation if they could have been at all times held? It's a legal question. I don't know the answer to it. Our understanding is that an ICE detainer would be the basis to hold someone suspected of not being cared lawfully. And our understanding, and as we had alleged in the complaint and in our brief, is that our understanding is that ICE detainers only last for 48 hours. So that would not extend to 13 days, to 19 days, to 42 days. And those are clear violations. But people, they wouldn't have a right to be out and about. Would they have a right to be out and about if they're not present lawfully? I don't know the answer. I'm not trying to say they don't. I don't see that that's discussed. Do you see what I'm saying? That they might not be similarly situated to other people that would have a right not to be in custody, given the fact that they might not possess the rights to be. We've had a really interesting argument about turning yourself in and whether you were legally present earlier today. Do they have a constitutional right to be free from incarceration if they are not, there's also the right to have them incarcerated upon them being found unlawfully present in the United States? Your Honor, so that's not at issue here. Why not? We're not alleging and we're not arguing that. And they're not arguing to the contrary? You have to say that they have a right to not be detained. They have to have a constitutional right that's being violated. So I'm asking, do they have a constitutional right that's being violated if they're not having a right to be free, lawfully free in the country? It's just a question. It's not, I don't know whether they do or not. Yes, so they have a right to be released from custody. So whether or not they would be put into custody of another office, that, oh, sorry. Yeah, based upon another reason. Yes, that would be a separate question, and that's not an issue here. Because what we've alleged is, and the claim here is that they need to be released from the county custody, so from legal custody there. And what happened after is not an issue here and is not something that needs to be resolved. And there's no arrangement with Texas and the United States or something that would have allowed them to continue to withhold people, detain people? Standing here, I can't, I'm not necessarily sure on that point, but I can say that whether or not there's a constitutional right on that front, I think isn't alleged in the complaint and it doesn't change the claim here, which is that they were held in county custody for longer than their sentence. Do you want to take on the state now? Yes. And so I actually think a lot of what I've said applies to the state appellants as well. So the claim against the state appellants is setting aside Taylor, who has a separate claim. The supervised reliability claim is that each of them were involved in this long, complicated release process where paperwork needed to pass through one organization, then another, then another, and then back and forth. And that each of the state appellants, as well as the county appellants, were responsible for one portion of this and that they failed to ensure that, and failed to adopt policies that would ensure that when released paperwork was received by their office or organization, that it was stamped and it was processed in a timely manner. And so that establishes supervisory liability as against all of the state appellants because each of them was a part of this release process. As for Taylor specifically, there's a direct liability claim that the plaintiffs assert against him, and that is based on the fact which was that he was sent a letter informing him that two of the plaintiffs were having charges against them dropped. And so after he received that letter, he is not alleged to have done anything after that happened. And as a result... Yes, yes, I believe he's, yes, he works in the state. And he, so he was sent a letter informing them that the plaintiffs were entitled to release. He did nothing for 40 plus days, and then eventually they were, after someone followed up about it, they were then released. And this case too is, falls under, I guess, well, the direct liability claim discussion in both Hicks and Crittenden, where, in Crittenden specifically, the defendants, two of the defendants there, had been informed by the plaintiff's parents that they were being over-detained, and yet they did nothing for 17 days. And that case directly informs the defendant's responsibility here. Because ultimately the clearly established question is whether the appellant should have known in the circumstances before them that what they were doing would result in an unconstitutional violation. And we think those facts are alleged here. I do want to... I'm having trouble. Assuming that Alvarado's 14-day delay was true, everyone must have all processed Ruiz de la Cruz's paperwork almost instantaneously. So how would Coe's actions be, or the VVTCPC or Gonzales, how would they be on the hook for Ruiz de la Cruz? Yes, Your Honor. So two responses to that specifically. The first is that there is a difference between the plea paperwork that needed to be stamped and the release paperwork that went through the process through all of the appellant's hands. And so that the plea paperwork was delayed and being stamped and that that is necessary before someone can be released does not necessarily impact or change the release process that happened with the paperwork that was being processed. The second is that under this Court's precedent, the plaintiffs are allowed to plead in the alternative. And specifically, you know, I'd point to this Court's decision in Cherry Knoll, which was decided a few years ago, which involved allegations, two allegations by the plaintiffs that neither of which could be true at the same time, but which this Court noted were pled and properly pled under Rule 8 in the alternative. I think there it was that subdivision plot was both duly approved and authorized by City Council, but also, second, that the approval was falsified. And this Court found that that was fine because under Rule 8, the plaintiffs are allowed to plead in the alternative. I guess it's the same question, but the complaint does not really allege that Gonzales implemented or failed to implement a specific policy that resulted in Ruiz de la Cruz's alleged overdue detention. What is the allegation that a specific policy that Gonzales implemented or failed to implement caused Ruiz de la Cruz's overdue detention? So we've alleged that there was a failure to adopt policies or, you know, an affirmative policy of not processing paperwork in a timely manner or a failure to adopt policies to process in a timely manner. At this stage, you're not to leave. We need to plead. But it's not clear that any policy that they had, that Gonzales or Co. had, caused any overdue detention. So it would be the failure. So it wouldn't be an affirmative policy in place. It would be a failure to adopt policies to ensure that paperwork was timely processed. This was the claim that was at issue in Crittenden where there wasn't an affirmative policy that was in place that was being followed. It was the fact that the state defendant there needed to enact a policy or to take some action to make sure that paperwork was being timely processed. I see my time is over. It just sounds archaic. I mean, you talk about paperwork being processed in a whole series of places where it has to get to and move on from and so on. And it's just a disaster waiting to happen. And it's archaic. I mean, you would think in the world that we live in today with the automation processes that we have that the system can be designed in such a way that you're not going to have the risk of failure that you have rampant in this system you've got now. It's just archaic. And nobody is losing any sleep over it, I would bet. Except the people who are the victims of it. Yes, Sharma, we would agree with that. I thought you might. Because you're the one they send in when the ox is in the ditch. And so you understand what the risks, what the problems are. Okay, thank you. Thank you. Thank you. Only you took a rebuttal. Okay. I'm sorry, Your Honor. Only you took a rebuttal. That's correct, Your Honor. May it please the Court. So, Judge King, I want to answer your concern about the legal framework here. The legal framework is deliberate indifference. Whether you're talking about personal involvement or so-called supervisory liability, which sounds to me a lot like vicarious liability, and I think the Court should try to stay away from that as much as possible. So... The legal framework. That's what happens when the legal framework, whatever it is, fails in some way, and then you apply the test, is what we're dealing with here, deliberate indifference. But the framework is not the same thing as deliberate indifference. Deliberate indifference is when the whole thing fails or gets screwed up. Right? Am I wrong? I think what you're hinting at, Your Honor, is that we might look at policymakers like the Court did in Crittenden, the supervisor of the Department of Safety and Corrections who oversaw a nearly 50-year pattern of overdetentions in the Louisiana prison system. Yeah, that sounds like... That's very different than what we have here, Chief Judge Elrod. What you hinted at was that there is a disaster that the governor has declared. These officials, low-level officials, they're in charge of individual prisons or, in the case of the counties, in charge of their county sheriff operations. That is a very good reason to distinguish this from Crittenden. And so, for personal... What's the burden to tell us that it's the same as Crittenden? The burden's on the plaintiff to overcome qualified immunity once it's asserted. And they haven't... Has it been asserted here? Excuse me, Your Honor? Has it been asserted here? Yes, Your Honor. So, for personal involvement, they have to show specific awareness. And under what this court has called a heightened pleading standard, under Baker v. Putnam, which we cite in our brief, they don't get there with the simple fact of the county attorney sending a letter. Even if you received it and read it, it says that the county attorney is recommending release. That's not sufficient because it doesn't have a court order, as Texas law requires for there to be a release. When a pretrial detainee has charges dropped, the state and the defense counsel take the defendant before a judge, they get a court order of release. That's not alleged to have happened in the manner where any of the wardens had specific awareness. In fact, the pleadings, as I mentioned in my opening, show that they were essentially released the same day that they were notified. Is that in the record, and can we consider that, or does that have to go to the next stage? That's in the pleadings, Your Honor. They've alleged that once TDCJ received notice, they were released either the same day or the very next day. And that's pages 39 through 41 in page 43 regarding each individual defendant. Well, they said that they were pleading simultaneously something else when I asked about that. And that's a conclusory allegation with regards to all the wardens. They don't say how they specifically failed to adopt a policy that caused the individual over detentions. How would they be responsible for getting the judges to get the things signed and sent over to them? They're not, Your Honor. And you don't have to look outside the complaints. That's the process that they have alleged. You're setting a policy and you're getting correspondence over and over again about over detentions. You're not unaware that there's a problem with over detentions. And that could lead to what you have in the Crittenden case, if it's long-standing enough. It wasn't as long-standing here to the extent that's alleged. That information was being transmitted, at least Martinez, that there was a problem with over detentions. They don't say when that was alleged to have made, so they failed to allege causation. But even if they're saying there's over detention, if your clients find out about that, they hear that there's over detention, or they even get a letter that says, there's over detention of my client. Unless your clients have a court order that says release the person, they can't do that, can they? That's correct. That's what Texas law would require. And I believe my friend on the other side cited you to the local government provision that says that. So is there any allegation that they had a stack of court orders and are not processing them? I see my time has expired. May I answer your question? Please do. No, there's not an allegation that any specific warden had court orders. And was ignoring them. Correct. Which is what the allegation in Crittenden is. Right? That they actually had released documents, bona fide release documents. That's not the allegation here. They had notification that. They served, that time served. Correct. People who had been convicted of offenses and weren't pretrial detainees, that their sentences had gone long. And even for the officials that were found to have acted promptly, even given the over-detention, they were found to have qualified immunity upheld. With that, we ask that you reverse and render judgment dismissing all the state officials. Thank you, Your Honor. Thank you. We have your argument.